June Term,
1860.

CONWAY
v.
SMITH et al.

</div>

---

CONWAY vs. SMITH and wife.

The statute (R. S. 1858, chap. 95) gives to married women, as necessarily inciden-
tal to the power of holding property to their own use, the power of making
all contracts necessary or convenient to its beneficial enjoyment, and such
contracts are to be regarded as valid in law, and may be enforced by legal
remedies. COLE, J., *dissenting.*

Imprisonment for debt is abolished, and the only result of a personal judgment
against a married woman is that her property is taken to pay it.

Action against husband and wife, upon a note executed by them for materials furnished by the payee for the construction of a hotel upon a lot owned by the wife: *Held*, on demurrer by the wife to the complaint, that the action could be maintained against her.

In an action against husband and wife, upon a joint and several note given by them for materials, &c, for the construction of a house upon the wife's land, a claim of the husband against the plaintiff for damages in consequence of his having furnished doors for said house made of unseasoned lumber, contrary to his agreement with the husband that the same should be made of seasoned lumber (for which doors the plaintiff had been paid the contract price), may be set up by the husband as a counter-claim.

APPEAL from the Circuit Court for *Milwaukee* County.

This action was upon a joint and several note executed by the defendants on the 16th of October, 1857, in this state, and the complaint alleged, in addition to the usual averments in such an action, that the note was given for work done and materials furnished in the construction of a hotel upon a lot in Janesville, which then was and continued to be the property of the defendant *A. M. C. Smith*, then and still the wife of the other defendant, *A. Hyatt Smith*. *A. M. C. Smith* demurred to the complaint as not stating facts sufficient to constitute a cause of action against her, and the circuit court sustained the demurrer, holding that a personal action in a case of this kind could not be maintained against a married woman.

*A. Hyatt Smith* filed an answer alleging that in January, 1857, he entered into an agreement with the plaintiff, by which the plaintiff was to furnish a large number of doors for the hotel referred to in the complaint, to be made of seasoned lumber; that the doors were delivered and the plaintiff was paid in full for them, the defendant believing at the time that they had been made of seasoned lumber; that the doors were in fact not made of well seasoned lumber, and after they were hung in said hotel, shrank from the frame work, &c., by which the defendant suffered damage to the amount of $130, and for the residue of the sum mentioned in the note, and costs, he offered the plaintiff judgment. The plaintiff demurred to this answer as not containing matter sufficient to constitute a defense or counter-claim, and the court overruled the demurrer. The plaintiff excepted to the rulings of the court, and appealed.

*Nelson Cross* and *Small & Cogswell*, for appellants, against the ruling of the court upon the demurrer of *A. M. C. Smith*, cited R. S., 1858, chap. 95, §§ 1, 2, 3 ; *Norval vs. Rice*, 2 Wis., 32 ; 2 Kent's Com., pp. 158, 159, 162–4 ; *Ringsted vs. Lanesborough*, 3 Doug., 197 ; *Barwell vs. Brooks*, id., 371 ; *Corbett vs. Poelnitz*, 1 Term, 5 ; *Hall vs. Delaplaine*, 5 Wis., 217 ; Story's Eq. Jur., 767, 770–2, 778, 1400 ; *Conn vs. Conn*, 1 Md. Ch. Decisions, 212 ; *Harris vs. Harris*, 7 Ire. Ch., 111 ; *Wylly vs. Collins*, 9 Geo., 223 ; *Boston vs. Cummins*, 16 id., 102 ; *Blood vs. Humphrey*, 17 Barb. (N. Y.), 660 ; *Albany Fire Ins. Co. vs. Bay*, 4 Comst., 9 ; *McCroan vs. Pope*, 17 Ala., 612 ; *Collins vs. Lavenberg*, 19 id., 682 ; *Hoot vs. Sorrel*, 11 id., 386 ; *Greenough vs. Wigginton*, 2 Greene (Ia.), 435 ; *Womack vs. Womack*, 8 Texas, 397 ; *Smith vs. Poythress*, 2 Florida, 92 ; *Jackson vs. Sublett*, 10 B. Mon., 467.

In support of the demurrer to the answer of *A. Hyatt Smith*, they cited Sedg. on Dam., 452, 453, 463 ; *Cram vs. Dresser*, 2 Sandf. S. C., 120 ; *Seymour vs. Davis*, id., 240 ; *Deming vs. Kemp*, 4 id., 147 ; *Reab vs. McAlister*, 4 Wend., 483, and 8 id., 109 ; 10 How. Pr. R., 77 ; 15 Barb., 9.

*Smith, Keyes & Gay*, for respondents, upon the first point, cited *Wooster vs. Northrup*, 5 Wis., 246 ; and upon the second, R. S., 1858, chap. 125, sub. 2 of sec. 11.

*By the Court*, PAINE, J. The demurrer of the defendant *A. M. C. Smith*, presents the question whether a married woman is liable on a contract to pay for improvements on her separate real estate. It is said that it has been settled in the negative by the decision of this court in the case of *Wooster vs. Northrup et al.*, 5 Wis., 245, and such was the opinion of the court below. I should have been glad if, on a careful examination of that case, I could have come to the same conclusion, and thus have felt relieved from the necessity of examining the question as a new one. But I have been unable to do so ; and on the contrary, think that this question was not raised in that case, and consequently could not have been decided. I feel compelled, therefore, to state my own conclusions upon it, and shall defer further comments upon that case until a subsequent part of the opinion.

It depends entirely upon the effect to be given to our statute concerning the rights of married women. And the question is, whether that statute removed to any extent, and if so, to what, the common law incapacity of a married woman to contract? I have examined it with the best attention and judgment I could command, and am entirely unable to see how the obvious intention of the statute can be accomplished, without holding that it does, to some extent, remove that incapacity. At the common law the legal existence of the wife was, for most purposes, merged in that of the husband. She was not allowed to hold property to her separate use; and in harmony with the same idea, she was denied the capacity to contract. The common law was consistent with itself. Having destroyed the power to hold and control her property, the power to contract, which is incident to the other, was destroyed along with it. But this rule, though consistent, was narrow and restricted, and did not meet the wishes or the interests of society. The court of equity, therefore, early found means to evade it, through the intervention of trusts for the separate use of married women. It is immaterial to my present purpose to notice the equitable doctrine upon that subject, further than to say that the substance which it secured, was the power of holding property to their separate use by married women. And having established this encroachment upon or evasion of the common law, it was then held that the power of disposition, and of making some contracts concerning the property, was necessarily incident to the power of holding and enjoying it. And that the one power is necessarily incident to the other, is the proposition I am now endeavoring to establish. In Roper on Husband and Wife, vol. 2, p. 239, it is said: "Courts of equity, however, *as a consequence* of the principle established by them, that a married woman may take and enjoy property to her separate use, enable her to deal with it as a *feme sole*. The right of disposition is an incident belonging to such interest and power." There has been some conflict in the equity decisions, as to whether the separate property of a married woman should be held liable to her general engagements, contracted without reference to such

separate estate. In *Hulme vs. Tenant*, 1 Bro. Ch. Rep., 16, the Lord Chancellor said : " If a court of equity says a *feme covert* may have a separate estate, the court will bind her to the whole extent, as to making that estate liable to her own engagements ; as for instance, for the payment of debts, &c." In the volume of Roper before referred to, p. 241, note a, the writer, in referring to this case, says : " Lord Thurlow here treated the liability to general engagements as a necessary incident to separate estate, arising from the capacity of contracting, which the possession of a separate estate confers." And after saying that the case had been followed by others, he proceeds : " One difficulty, however, occurs in the reasoning which led to this conclusion. The possession of separate property was said to enable a *feme covert* to act as a *feme sole* in respect to that property. It did not however follow that the disability of coverture was so far removed as to give her the capacity of contracting generally in matters connected with her separate estate. For this reason it was difficult to support the principle of holding the wife's separate property liable to her engagements, unless it appeared that such engagements were formed with reference to that property." I have no occasion now to examine whether or not the rule of *Hulme vs. Tenant* has become established as the equity rule. It may be as equitable and just that a married woman should pay her debts contracted without reference to her separate estate, as that she should pay those contracted with respect to it. And it was upon this ground that the earlier as well as the later cases placed the liability, " repudiating the fiction of an appointment," about which so much forced and unsatisfactory reasoning had been presented. See COMSTOCK's opinion, *Yale vs. Dederer*, 18 N. Y., 274. But when the question is, how far the power of contracting is necessarily incident to the power of holding and enjoying separate property, I think the distinction of the writer in the note to Roper, which I have just quoted, is well taken. For while it seems quite obvious that the power to make some contracts is absolutely essential to the power of holding and enjoying property, it

*Margin note:* June Term, 1860. CONWAY v. SMITH et al.

seems just as obvious that the power to contract to an un-limited extent is not so. Thus, if a married woman owns an improved farm which she is unable to cultivate herself, the power to hold and enjoy it as a *feme sole* necessarily involves the power of contracting for labor to cultivate and keep it in repair. At the same time, it would not at all involve the necessity of a power on her part to contract as a common carrier, or in any other capacity equally remote from all connection with her separate estate. I deem this distinction clear and important, and upon it my opinion of this case has turned. I have alluded to it now to show that while there are some equity decisions which would sanction the doctrine that the power to hold separate property involves the right of contracting generally, which may be questionable, all admit that this power carries with it, as an incident, the power of making such contracts as are necessary or convenient to the enjoyment of the property so held.

I have said that in equity married women were allowed to contract with reference to their separate property. It is true that the courts only subjected their property to the payment of their engagements, and did not render a personal judgment against them. This course was adopted out of deference to the common law, which they did not wish to encroach upon further than was necessary to secure the substance of the right of holding property and contracting with respect to it. But whatever expressions may be found in the cases, recognizing the existence of the common law incapacity, and whatever strained efforts may have been made to transform a simple personal engagement by a married woman into an appointment of her separate estate, yet they have failed entirely even to disguise the doctrine, which stands out boldly in equity jurisprudence, that a married woman may contract as a *feme sole* with respect to her separate property. In *Hulme vs. Tenant*, the attorney general, who argued against the validity of the security, said: "I do not contend that a married woman cannot contract in respect to her separate property." And from that time to the present the cases and elementary works are filled with express assertions that in equity she could contract as a *feme*

*sole.* In *Hauptman vs. Catlin,* 20 N. Y., 248, the court of appeals says; "Even before the late statutes respecting married women, they were regarded as *femes sole* in respect to their separate property, and were, as to such property, liable on their contracts respecting the same, to the same extent as though they were not under the disability of coverture."

Such then being the common law, and such the rule in equity, when our statute concerning the rights of married women was passed, what was its intention? The conclusion seems to me inevitable that when the law restored to married women the power of taking and holding property as if unmarried, it gave, as a necessary incident thereto, the power of contracting with respect to it. I suppose it would not be disputed that if the latter power is a necessary incident of the former, then it passed by the grant of the former, without being expressly mentioned. But if I am at all capable of understanding the legitimate effect of the equity doctrine upon this subject, it bears with its whole weight in favor of the proposition, that the power of contracting with respect to it is a necessary incident of the power to hold and enjoy a separate estate.

That it is so seems really too obvious for argument. Take for example the case I have already supposed, of a married woman with an improved farm, which the law says she may "hold to her sole and separate use," "in the same manner and with like effect as if she were unmarried." How is she to do this without the power to contract? If there are crops which need harvesting, or fields to be sown, or repairs to be made, has she no power to contract for the necessary labor? It is idle to talk of her holding property as if unmarried, without this power. It is simply impossible. If she has it not, then no one has. Neither her husband nor any other person has any legal right to control or interfere with it. They, therefore, who deny that this statute gave her the power to contract, must impute to the legislature the unreasonable intention of withdrawing her property from her husband's control, and placing it wholly under her own, and yet withholding from her all the means necessary to its ben-

June Term,
1860.

CONWAY
v.
SMITH et al.

eficial enjoyment. If she has a factory, who is to employ the laborers? If she has buildings needing insurance, who is to obtain the policy? I can give no answer to these questions, except on the theory that the statute gives her the power of contracting. And it is incumbent on those, if any such there are, who deny this theory, to show in what manner she is to hold her property, under the statute, and enjoy it as a *feme sole*, without this power.

It cannot be assumed that the law makers intended to rely on equitable aid to help out the objects of the statute. That would be to say that they intended to make a law that should be insufficient to accomplish its own purposes. No! It must be assumed that they intended to attain their objects by law, and not by equity without law. And assuming this, it must be held that they intended to place the property of married women beyond the power of legal beneficial enjoyment by any body, or that they intended to give her the power of contracting in regard to it.

I am aware that there are some decisions in New York upon their statute, which is like ours, where it is said that it did not enlarge the capacity of married women to contract. Such was the opinion of COMSTOCK, J., *Yale vs. Dederer*, 18 N. Y., 272. The learned judge says: "I think it is plain, however, that the statute does not remove the incapacity which prevents her from contracting debts. * * * * It is quite another question, however, whether she may not charge her legal estate, held under this statute, in the cases and to the extent recognized by courts of equity, in respect to estates held under a trust for her separate use. The right to charge her separate estate in equity, resulted from the *jus disponendi* which courts of equity regarded her as having, and it was a necessary incident of the full enjoyment of her property. It would seem, for reasons quite similar, that she should have the power to charge an estate acquired and held under the statute referred to. * * * * My conclusion, therefore, is, that although the legal disability to contract remains as at common law, a married woman may, as incidental to the perfect right of property and power of disposition which she takes under this

statute, charge her estate for the purposes and to the extent which the rule in equity has heretofore sanctioned in reference to separate estates."

It will be seen that the learned judge here says that the common law incapacity to contract remains; but it seems to me that what he admits necessarily refutes that proposition. For he could not deny that whatever a married woman may do by virtue of the statute, would be valid in law as well as in equity. If then she may by this law do, with respect to her property, which she holds under it, what in equity she might with respect to her separate estate, she may contract in regard to it, for she could do that in equity. And such contract must be a legal contract because made under the authority of the statute. And if so, the common law incapacity to contract does not remain. It seems to me imperatively incumbent on any one who asserts that it does remain, to show how it can be that when the law gave the principal power to hold and enjoy property, it did not give the necessarily incidental power of contracting in regard to it.

It is said in the extracts quoted, that a married woman might in equity "charge her estate" as an "incident of the *jus disponendi*," and that she may charge it under this statute. But this of course does not mean that she could charge it only by some act purporting specifically to dispose of it. For further on in the opinion it is expressly shown to be "settled" that notes or bonds of married women, made on their own account, are to be satisfied out of their separate estate, and further, that such notes or bonds cannot, "except by a fiction," be regarded as "a charge upon" or "disposition of the property." And the conclusion upon that point is thus stated: "The principle, in short, which now governs in cases of this kind, is, that a wife's separate estate is liable to pay her debts during coverture, in whatever form they are incurred, not because her contracts have any validity at law, *nor by way of appointment or charge*, but because equity decrees it to be just that they should be paid out of her estate." The sum and substance of it is, because equity regards her contracts in regard to her property, or made on

her own account, as valid, though not valid in law. When therefore the learned judge admitted that, under the statute, she might charge her estate to the same extent and for like purposes that she might before in equity, it seems to me in substance saying that such of her engagements as would have been enforced in equity, would, under the statute, be valid in law. And upon what other theory she could accomplish under the statute, what she before might in equity, I am unable to comprehend. I think the case of *Yale vs. Dederer* was correctly decided; for the power of contracting to pay her husband's debts could not be claimed as incidental to any power which the statute gave; and the wife executed no instrument amounting to a charge upon her estate. But I cannot assent to the position taken, that the statute did not remove at all the common law incapacity of married women to contract.

And I think the subsequent case of *Hauptman vs. Catlin*, 20 N. Y., 247, shows that the court of appeals did not then hold that view. They there held that the property of a married woman was liable to the remedy given by the Mechanic's Lien Law, on a contract made by her, like the property of any other owner. They use this significant language: "We may admit that the act of 1849 did not enlarge the capacity of a married woman to make contracts. She could already contract for repairs or improvements to her separate estate, as fully as one not under any disability could do it. The remedy of the other contracting party was for a time confined to chancery; but when the lien law was passed, it might be sought in the same forum and under the same forms of proceeding as though the claim came within the description of demands formerly called legal. * * When therefore a general statute gives a lien against all owners who shall become parties to certain contracts, married women, as well as unmarried ones and men, are embraced."

Now if I correctly understand this, the court admits that the statute did not enlarge the capacity of married women to contract concerning their separate property, not because they could not make any contract under it, but because they

already had the power as fully as it could possibly be claimed under the statute. And this impliedly admits that they might contract under the law, as they were before permitted to do in equity. So that the law, instead of enlarging their capacity to contract, only had the effect of rendering their contracts valid at law, and enforceable by the same legal proceedings as the contracts of other owners.

I also understand that the case of *Wooster vs. Northrup* itself admits by the strongest implication, and perhaps expressly, that the statute grants to married women the power of contracting to some extent. The court says: "But it does not appear to have been the intention that she should have *unlimited* power to engage in trade, and to contract debts *irrespective of the property which belonged to her.*" And again: "The legislature do not appear to have intended that she should have the power to engage in trade, *except so far as may be necessary to manage the property which she may own.*" Now this distinctly implies that she might "engage in trade," and, of course, by the same reasoning, make any other contract, "as far as was necessary to manage" her property. The decision was that the statute did not give married women an "*unlimited power*" to contract, irrespective of their property. The chief justice industriously uses that phrase in his opinion, and the learned reporter, himself one of the judges then on the bench, so states the decision in his head notes.

And that was the question presented in the case. Married women, owning a joint interest with others in certain real estate, purchased the others' shares and gave their note for it. Now it cannot be claimed that the power of purchasing the shares of other owners is incidental to the ownership of an undivided interest in real estate. A married woman, owning one farm, could hold and enjoy it without the power of purchasing another. So of an undivided interest. It could be partitioned and each hold her share. The contract in that case, therefore, could not have been held valid, except upon the theory that the statute gave an "unlimited" power to contract, "irrespective of her property." The court held that it did not, and that no judgment could be

June Term,
1860.

CONWAY
v.
SMITH et al.

rendered against the married woman on the note.    But that a married woman could not, under the statute, make a valid contract for the improvement or management of her separate estate, they did not decide, but strongly intimated that she might.    I am compelled to say, therefore, that our statute did give to married women, as necessarily incidental to the power of holding property to their own use, the power of making all contracts necessary or convenient to its beneficial enjoyment, and that such contracts are to be regarded as valid in law.    This court decided in *Norval vs. Rice*, 2 Wis., 22, that the statute gave her the power to súe alone, as necessary to the full enjoyment of the powers expressly conferred.    Yet the power of contracting is quite as essential, and the principle of that decision fully sustains the conclusion that this was also granted.

If it be established then that her contracts respecting her separate estate are valid in law, I think it necessarily follows that they may be enforced by legal remedies.    I know that the court in *Wooster vs. Northrup* says: " We must, therefore, hold that a personal action cannot be maintained under our statute against a married woman."    And I concede that this sentence, taken alone, would indicate that the court held that no personal action could be maintained upon any contract by a married woman.    But when construed as applicable to the facts of that case, and in connection with the remarks which precede it, I think it can only be held to mean that a personal action could not be sustained on a contract like that, which was itself not authorized by the statute. The sentence is the conclusion of the remarks already referred to, that the statute did not give an " unlimited " power to contract, and must be held applicable only to an action on a contract requiring unlimited power to sustain it.    But they did, as before shown, distinctly imply that a limited power of contracting was conferred.    When, therefore, such a contract is made, did they intend to say that though authorized by law, still no legal action could be sustained upon it ?    I cannot so interpret it.    The difficulties of such a construction seem to me insurmountable.    If she cannot be sued on such contracts, she cannot sue.    For the idea is not to be

admitted for a moment, that the legislature intended to arm her with the power of contracting, so as to bind other people, but not herself. The obligation and the remedy, if they exist at all, must be mutual. But without the power to sue upon such contracts, how is she to protect herself? It is to be remembered that the statute provides for no trustees to bring actions upon legal contracts in her behalf. If then she obtains a policy of insurance and the company refuses to. pay, upon a loss, what is her remedy? Could she bring an equitable action to collect it? Suppose she contracts with a carpenter to repair her dwelling, and he violates the contract, can she bring an equitable action for the damages? Laying out of view what seems to me the unreasonableness of imputing to the law an intention to make a resort to equitable aid essential to its execution, I have never heard of equitable actions for such purposes. I know of no remedy she would have except a legal action on the contracts. But if she could sue, she could be sued. And the right to be sued is essential to her protection; otherwise nobody would contract with her.

There seems to me to be an undue reluctance with some to admit that a married woman can contract or be sued at law. Justice COMSTOCK said that her "incapacity" was her "best protection." But how can this be, when it is conceded that her contracts respecting her separate estate, even though void at law, would be enforced in equity? Is it really of any serious importance whether payment of her debts is enforced by an action that was formerly called legal or by one that was formerly called equitable? If it is, I fail to perceive it. The result is the same; the difference is only in the mode of arriving at it. Imprisonment for debt is abolished. The only result of a separate judgment is that her property is taken to pay it. That is precisely what equity did without a personal judgment. What protection is it then to tell her that her contract is invalid at law, and that the law will not compel her to pay, and then send the plaintiff to a court of equity which will compel her to pay? Evidently none at all. It is clinging tenaciously to mere form when the substance has departed.

The two distinct systems of law and equity, as known in England and America, are an anomaly in jurisprudence. Both are essential to a complete administration of justice, and it might be difficult for a stranger to their history to understand why they were ever separated. In this country they are being blended into one harmonious whole. That has been done in this state. When, therefore, the only point in controversy is, whether a certain contract shall be enforced by what was a legal, or by what was an equitable action—it being settled that it must be enforced in some way—it seems to me there is nothing in the result of a decision either way, that should induce reluctance in any court to give to this statute such an effect as its obvious intention demands. It is unreasonable to attempt to retain the incidents of the common law rule, when the statute has abolished that rule. And for one, I never discovered any such superior merit in the rule itself, as would induce me to attempt, as courts sometimes do, to retain by a strict construction what it was the evident design of the statute to change. And I apprehend no increase of domestic discord from the change produced by the statute. On the contrary, I think the higher respect shown by the law for the rights of the wife, will tend to produce respect for her rights among individuals. The consciousness of her legal authority to enjoy her own, aided by the sense of its obvious justice, will be more productive of mutual forbearance and respect, and consequently of domestic harmony, than the absolute subjection of the common law.

The statute leaves no room for saying that its sole object was to provide that the property of married women should not be liable for their husbands' debts. That could have been accomplished by a simple enactment to that effect. But this provides not only that, but goes further, and takes the property from the control of the husband, and places it under her control. In view of these provisions, no court can stop short by saying that its object was only to protect it against her husband's debts. It must be shown how she is to hold and enjoy it as a *feme sole*. I am therefore of the opin-

ion that the demurrer of the wife should have been over-ruled.

But I agree with the court below that the damages claimed by *A. Hyatt Smith*, as a counter-claim, were the proper subject of a counter-claim, and that the plaintiff's demurrer to his answer was properly overruled. The damages claimed were a cause of action arising on contract, and one concerning the construction of the same building as the one set forth in the complaint. It is therefore within the letter, and I think clearly within the spirit and intention of the statute allowing a counter-claim.

The order sustaining the demurrer of the wife should be reversed, with costs. The order overruling the demurrer of the plaintiff to the answer of *A. Hyatt Smith*, should be affirmed, with costs, and the cause remanded for further proceedings.

COLE, J. I am unable to concur in the conclusion to which a majority of the court have arrived in overruling the order which sustained the demurrer of *Mrs. Smith*. In my judgment that conclusion is in conflict with the decision of this court in the case of *Wooster vs. Northrup et al.*, 5 Wis., 245. In the latter case it was held that the law of 1850, entitled " an act to provide for the protection of married women in the enjoyment of their property"—which law, with some additional provisions, has been incorporated in the revision of 1858 as chapter 95—did not remove the common law disability of a *feme covert* to make contracts generally, and render herself liable to actions upon them; but that the object of the law was to secure to the wife the enjoyment of her own property, and prevent it from becoming liable for the debts of the husband, or being sold or in any way controlled by him without her consent. I cannot entertain a doubt that the court there rightly interpreted this enactment of the legislature ; and that its principal object was to secure to the wife the enjoyment and control of her property, and to abrogate, in a great measure, the rights which the husband acquired over it at common law by virtue of the marriage relation. Such I deem the correct construction of this law, as is

apparent from the whole scope and spirit and language of each of its provisions. The law unquestionably enlarges the power of a *feme covert* to make contracts in respect to her separate estate, because it says she may hold to her sole and separate use any real or personal property acquired as therein named, and may convey and devise the same, or any interest or estate therein, and the rents, issues and profits thereof, " in the same manner and with like effect as if she were unmarried." This she could not do at common law, and so far the statute breaks in upon the common law rule. She may now dispose of her property without the consent of her husband, since the law has clothed her with this power over it. Further than this I do not think the law has endowed the wife with the power to make contracts. I cannot think it removes the disability of a *feme covert* to purchase upon credit, to make promissory notes and other personal obligations, and then subjects her to personal actions upon them, and all the liabilities incident to those contracts when made by a *feme sole*. For if a judgment is rendered against a married woman, upon a promissory note given by her, what property will be bound by it? Does it bind the property only which she owns at the time of the rendition of the judgment, or does it bind after acquired property as well? Is the collection of the judgment to be enforced by execution and the ordinary processes of the courts? If so, can a married woman claim any benefit from the exemption laws? I suggest these questions, not so much for the purpose of showing that the remedy upon the personal obligation of the wife could not be made effectual, as to strengthen the view I have already advanced that the legislature did not intend giving a married woman power to make such contracts and render herself liable to actions at law upon them; otherwise it seems to me they would have made some further amendment to the statute, to more fully protect her property, and at all events extend to her the privileges of the exemption law.

It is a familiar doctrine that notwithstanding the disabilities of coverture, a married woman might charge her separate estate with the payment of a debt, which a court of equity would enforce. But this relief was peculiar to a

court of equity, and was not given by a court at law. So when a married woman gave a mortgage upon her separate estate to secure the payment of her promissory note, this court sustained a bill to foreclose the mortgage, while denying that an action at law could be maintained upon the note. *Heath vs. Van Cott*, 9 Wis., 516. In such a case the court proceeds *in rem* against the property, but gives no further effect to the personal obligation than to charge the estate with the payment of the debt. But now it is proposed to go further and affirm the validity of a promissory note given by a *feme covert*, and sustain an action at law upon it. This, I think, cannot be done. I do not think the legislature intended to make any such innovation upon the principles of the common law, by enacting the law under consideration. Without pursuing the discussion further, I will merely reiterate what I have already said, that I have no doubt but in *Wooster vs. Northrup* the court placed the proper and correct construction upon this legislation. The object and effect of such legislation have likewise been so fully discussed by the courts of other states, when considering laws of a like character, that I could not, even were I to attempt it, throw any new light upon the question. And it is certainly important to notice with what emphasis they negative the idea that these laws remove the common law disability of a *feme covert* to make personal contracts and render herself liable to an action at law upon them. See *Yale vs. Dederer*, 18 N. Y., 265 ; *Same Case*, 31 Barb. (S. C.), 525, and also in 22 N. Y., 450 ; *Bailey vs. Pearson*, 9 Foster, 77 ; *Merrill vs. Smith*, 37 Maine, 394 ; *Swift vs. Luce*, 27 id., 286 ; *Howe vs. Wildes*, 34 id., 572 ; *Fuller vs. Bartlett*, 41 id., 241.

I therefore think the order sustaining the demurrer of *Mrs. Smith* should be affirmed.